FILED _____ ENTERED
LODGED _____ RECEIVED

MAY 1 3 2015

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEP.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

IN THE MATTER OF THE SEARCH OF:        )
                                                              )   **CRIM NO.** TMD 15-818
**14225 GRAND PRE ROAD, APT 101**      )
**SILVER SPRING, MARYLAND 20906**      )
**AND COMPUTERS AND ELECTRONIC**    )
**STORAGE DEVICES CONTAINED THEREIN** )
                                                              )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

     1.     I, Loi H. Cao, am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed for approximately six years and have been assigned to the Baltimore Division. From November 2014 until the present, your affiant has been assigned to investigate violations of Federal law involving white collar violations, including economic crimes. Through training and experience, I have become familiar with the methods and techniques associated with economic crimes, including wire fraud, mail fraud and bank fraud.

## SEARCH OBJECTIVE

     2.     This affidavit is made in support of an application for a search warrant to search a residence located at **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**. Specifically, authorization is sought to search for and seize evidence of violations of Title 18, United States Code, Sections 1343 (Bank Fraud), 1343 (Wire Fraud), 1028 (Identity Theft), and 1028A (Aggravated Identify Theft). The items that are the subject of the requested search are more specifically described in Attachment A.

     3.     The facts in this Affidavit come from my personal investigation, from discussions with other agents of the FBI, Postal Inspectors of the United States Postal Inspection Service



("USPIS"), witness interviews, review of records, and through other investigative techniques.

4.      Since this affidavit is being submitted for the purpose of securing a search warrant, I am not including each and every fact known to me in this investigation.

## LOCATION TO BE SEARCHED

5.      This affidavit is submitted in support of an application for the search of the following location and curtilage thereto, controlled by SIGISMOND SENYO SEGBEFIA, as more fully described in Attachment A:   A two bedroom apartment within a multifamily residential building having a common street address of **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**.  The entrance to the apartment building has a red colored awning with the numeric insignia "14225" displayed in white.  (Hereafter, subject residence)

## INDIVIDUALS AND ENTITIES RELEVANT TO
## THE FEDERAL INVESTIGATION

6.      SIGISMOND SENYO SEGBEFIA is a Ghanaian national with a date of birth of May 9, 1986, SSN xxx-xx-4071.   Maryland Department of Transportation, Motor Vehicle Administration records indicate SEGBEFIA is currently residing at **14225 Grand Pre Road, #101, Silver Spring, MD 20906**.  Law enforcement databases indicate SEGBEFIA was born in Ghana and entered the United States on or about January 15, 2011.   SEGBEFIA is legally residing in the United States as a Lawful Permanent Resident and may live and work in the United States.

7.      EASTERN STARS, LLC – was officially formed in the State of Maryland on or about 10/24/2013.  Maryland open source database checks identify SEGBEFIA as the current Registered Agent and that the corporation is in current and good standing.  Financial records

2



obtained during the investigation illustrate SEGBEFIA is the sole member of EASTERN STARS, LLC.

8.      VICTIM MJL – is a 61 year old female residing outside the District of Maryland.

9.      VICTIM SMP – is a 48 year old female residing outside the District of Maryland.

10.     VICTIM MARK A. WAGNER – is an adult individual, residing outside the District of Maryland.

11.     MORONI FEED COMPANY – is a business entity located outside the District of Maryland. Moroni Feed Company is a turkey producing and processing cooperative, located in Moroni, Utah, which produces the Norbest brand of turkey food products.

12.     VICTIM DOSKO CO LTD – is a business entity located outside the District of Maryland. Dosko Co LTD is a steel manufacturing company located in South Korea.

13.     For the following reasons, your affiant has probable cause to believe that contained within the subject residence are fruits and instrumentalities of the crimes of bank and wire fraud conspiracy, wire fraud, bank fraud, identity theft, and aggravated identity theft.

## PROBABLE CAUSE

### A.      Victim MJL

14.     VICTIM MJL created an account on the Internet dating website known as ChristianMingle.com. In October 2013, MJL met an individual purporting to be MARK A. WAGNER (WAGNER).

15.     WAGNER claimed to be Australian, a white male, 5'11" in height, 55 years of age, and a widower for about 10 years. WAGNER claimed to have moved to the United States when he was 20 years old. WAGNER claimed to own his own business in the medical

3



equipment industry located in the Pittsburgh metro area.

16.     At some point in October 2013, MJL and WAGNER exchanged personal email address and phone number information to communicate with each other outside the ChristianMingle.com website.     WAGNER provided MJL with his email address AWAGNERM@YAHOO.COM.  By the end of October 2013, WAGNER initiated telephonic contact with MJL.

17.     Prior to the Thanksgiving holiday 2013, MJL requested to meet WAGNER in person to further their relationship.  WAGNER claimed he had to travel to England for business. WAGNER claimed to have a large contract with a company in England to sell medical equipment and that he had already shipped the equipment from Pittsburgh to England. WAGNER claimed he was going to fly to England to be there when the equipment arrived.

18.     Shortly thereafter, WAGNER explained to MJL there was an issue with England's version of the United States Customs and Border Protection.  WAGNER claimed there was something wrong with the way the contract for the equipment was written and WAGNER needed funds to correct the problem.  WAGNER asked MJL for $23,000 to be wired to him in order to correct the problem.

19.     On or about December 3, 2013, MJL sent the first of many wires to help WAGNER with his financial troubles.  Over the course of the following approximate nine months, WAGNER came up with additional problems or excuses, to fraudulently induce MJL to wire him personal funds, for why he could not close the equipment sale and travel back to Pittsburgh from England.  Each story and excuse was accompanied with a request for MJL to wire WAGNER funds to help him with his financial difficulties.  MJL advised WAGNER did

4





not document his request for funds in an email.   MJL stated every request was done telephonically.  MJL further stated WAGNER had a male foreign accent which at times was hard for MJL to comprehend.

20.    Some examples of WAGNER's purported "financial difficulties" as communicated to MJL are as follows:  WAGNER needed funds to purchase a defective or missing part; WAGNER needed funds to pay for equipment storage fees while waiting for the sale to close; WAGNER needed insurance for the $3.5 million sales proceeds to clear England's Customs; there was a problem with the bank's paperwork preventing the issuance of the sales proceeds check;  WAGNER was arrested after assaulting a bank official for not issuing the sales check and he needed legal fees to get him out of jail; WAGNER needed funds to pay for temporary lodging while waiting for the sale to close; and WAGNER needed funds to pay for medical bills as he became ill in England while waiting for the sale to close.

21.    WAGNER provided MJL with the wire transmittal information in an email to her. WAGNER requested MJL wire personal funds to an account WAGNER maintained at BB&T Bank styled in the name of EASTERN STARS, LLC.  WAGNER never explained what EASTERN STARS, LLC was.  MJL assumed EASTERN STARS, LLC was the name of WAGNER's medical equipment company.   WAGNER claimed he had an accountant at EASTERN STARS, LLC's business offices, located at 14106 Chesterfield Road, Rockville, MD 20853.  Once the funds were received, WAGNER claimed the accountant would wire the funds to WAGNER in England.

22.    Sometime in January 2014, MJL began to worry WAGNER may not be legitimate.  MJL requested that WAGNER execute a promissory note that MJL drafted to ensure

5



that WAGNER would pay back MJL's funds.  WAGNER provided MJL with his address as 3170 Robinson Run Road, McDonald, PA 15057.  The note was to be paid in full by March 1, 2014 in the amount of $74,867, which was the approximate accumulated funds MJL wired WAGNER to date.  WAGNER purportedly signed his name on the note on or about January 16, 2014, and emailed it back to MJL.  MJL advised WAGNER's expectations that he was going to obtain the $3.5MM contract and the executed promissory note gave MJL assurance that WAGNER was going to pay her funds back by March, 2014.

23.     Between December 3, 2013 and August 25, 2014, MJL sent 11 separate wire payments totaling $185,500 to WAGNER's EASTERN STARS, LLC BB&T bank account number ending in 9123, per WAGNER's instructions.  In addition, between May 2014 and June 2014, MJL directed a friend to send two separate wire payments totaling $22,000 to WAGNER's EASTERN STARS, LLC BB&T bank account on behalf of MJL.  MJL borrowed the funds and is responsible for the repayment to MJL's friend.  In total, MJL wired, or directed to be wired, thirteen separate wires to WAGNER totaling $207,500.   The wires originated in the Western District of Pennsylvanian and were sent to EASTERN STARS, LLC's bank account located in Maryland.

**B.     Mark A. Wagner**

24.     On January 23, 2015, the case agent located and interviewed an individual named MARK A. WAGNER, who resides at 3170 Robinson Run Road, McDonald, PA.  WAGNER is a white male, 54 years old, and is a United States Postal Service (USPS) employee.  WAGNER has been employed with the USPS for approximately 29 years.  WAGNER does not own or operate a medical equipment company.

25.    WAGNER does not know, and has never heard of, MJL.

26.    WAGNER does not own a personal computer.  WAGNER does not know the email address AWAGNERM@YAHOO.COM.    WAGNER did not create the AWAGNERM@YAHOO.COM email account.  WAGNER does not have a yahoo.com email account.  WAGNER does not have a ChristianMingle.com online account and has never visited the ChristianMingle.com website.    WAGNER does not know the name SIGISMOND SEGBEFIA or EASTERN STARS, LLC.

27.    WAGNER was provided with a copy of the note between MJL and the person claiming to be WAGNER.  WAGNER reviewed the note agreement and advised he never saw the note agreement and the signature on the bottom of the document, purporting to be that of MARK A WAGNER, was not his handwriting and signature.

**C.    Eastern Stars, Llc's Bb&T Bank Account Ending 9123**

28.    The case agent obtained and reviewed records received from BB&T for the EASTERN STARS, LLC account ending in 9123.  On or about December 2, 2013, SEGBEFIA opened a BB&T Bank business checking account, account number ending in 9123.  The account was styled in the name of EASTERN STARS, LLC.  SEGBEFIA is the only authorized signer on the account.  At the time the account was opened, the mailing address listed for the business is 14106 Chesterfield Road, Rockville, MD, 20853.  However, sometime after the statement ending June 30, 2014, SEGBEFIA changed the mailing address to **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**.

29.    The case agent analyzed the activity for the EASTERN STARS, LLC BB&T account ending in 9123.  The case agent was able to identify each of MJL's thirteen wire

7



payments totaling $207,500.

30. In addition to MJL's wired deposits, the case agent identified what appears to be as many as seven additional female victims, located throughout different parts of the United States, who together wired over $262,000 into the EASTERN STARS, LLC account. One potential victim, VICTIM SMP, sent three separate wires totaling $177,000.

31. The case agent noted disbursements from the account included over $5,000 in ATM withdrawals, thirty nine (39) checks made payable to "Cash" totaling over $325,249, and four (4) checks made payable to "Sigmond Segbefia" totaling $25,160.

32. In addition, the case agent noted six (6) outgoing wires totaling $35,000 to a company named LIGHT SONS ENT. LTD at Firstrand Bank LTD Head Office, one (1) outgoing wire in the amount of $20,000 to LIGHT SONS ENT. LTD at Guaranty Trust Bank (Ghana) LTD, and one (1) outgoing wire in the amount of $15,000 to ALBERT BOAFO at SunTrust Bank.

33. The case agent has not been able to determine any information for the company LIGHT SONS ENT. LTD. However, through open source Internet searches, the case agent has determined that Firstrand Bank LTD Head Office is a South African bank located in Johannesburg, South Africa. In addition, through open source Internet searches, the case agent has determined that Guaranty Trust Bank (Ghana) LTD is located in Accra, Ghana.

34. The EASTERN STARS, LLC BB&T account ending in 9123 was opened on December 2, 2013, the day before MJL wired her first payment of $23,000. The case agent has determined the account does not have any legitimate source of funds deposited into the account other than MJL, SMP, and the other potential female wire fraud victims. Further, it does not

8



appear that SEGBEFIA uses the funds from MJL, SMP, or the funds of the other potential female wire fraud victims, for any legitimate business purpose. The vast majority of funds disbursed from the account were for cash, to SEGBEFIA personally, and to an unidentified business located in Ghana and South Africa.

**D.     Sigismond Segbefia Bank of America Account Ending 4854**

35.     During the investigation, the case agent obtained and reviewed records received from Bank of America (BOA) for an account styled in SEGBEFIA's name ending in 4854. On or about March 22, 2011, SEGBEFIA opened the BOA personal checking account. SEGBEFIA is the only authorized signer on the account. At the time the account was opened, the mailing address listed for the account was **14116 Grand Pre Road, Apt 23, Silver Spring, MD 20906**. However, sometime after the statement ending July 18, 2014, SEGBEFIA changed the mailing address to 14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906.

36.     The case agent analyzed the activity for SEGBEFIA's account ending in 4854. The case agent was able to identify a PAYPAL recurring debit for ChristianMingle.com on November 5, 2013 in the amount of $62.75. The case agent also noted the following month, specifically on December 3, 2013, a PAYPAL credit for ChristianMingle.com in the amount of $62.75 was made to the account.

37.     The case agent believes SEBGEFIA fraudulently assumed the persona and identity of MARK A. WAGNER. The case agent concludes SEGBEFIA fraudulently opened the ChirstianMingle.com account in the name of MARK A. WAGNER in order to identify unsuspecting women and fraudulently induce them to wire him money under false pretenses.

38.     From speaking with MJL, and the case agent's review of the EASTERN STARS,



LLC BB&T account ending in 9123, the case agent knows MJL's first wire to WAGNER was made on or about December 3, 2013. The case agent concludes once SEGBEFIA was successful in communicating with MJL outside the ChristianMingle.com website and inducing her to wire him funds to his EASTERN STARS, LLC BB&T account, SEGBEFIA terminated his membership with ChristainMingle.com and obtained a full refund - literally on the same day MJL wired her first payment.

### E.  Bank Fraud – Victim Bank Of America

39.     During the investigation, the case agent obtained bank records for an account at SUNTRUST styled in the name of EASTERN STARS, LLC. The account number ending in 2877 is a business checking account that was opened on or about January 16, 2014. SEGBEFIA is the only authorized signer on the account. The address listed for EASTERN STARS, LLC is 14106 Chesterfield Rd, Rockville, MD 20853. However, at some point after the statement ending date of March 31, 2014, SEGBEFIA changed the mailing address to **14225 Grand Pre Rd, Apt 101, Silver Spring, MD 20906**.

40.     The January 16, 2014 opening deposit was a business check made payable to EASTERN STARS, LLC, dated December 27, 2013, check number 015231, in the amount of $23,225.76. The maker of the check was the MORONI FEED COMPANY (MORONI), located at 15 East 1900 South Feed Mill Road, Moroni, UT 84646. The check was drawn off MORONI's bank account maintained at Bank of America.

41.     The case agent has become familiar with SEGBEFIA's signature from the review of numerous official financial records and documents which bear SEGBEFIA's signature. The case agent observed an endorsement on the back of the MORNONI check that appeared to match



the signature of SEGBEFIA.

42.     Following the $23,225.76 MORONI check deposit, SEGBEFIA conducted five (5) transactions that effectively disbursed the full amount of the MORONI check.  On January 27, 2014, SEGBEFIA transferred $19,000 to another SUNTRUST account styled in the name of EASTERN STARS, LLC, account ending in 6502.  SEGBEFIA also conducted two (2) ATM withdrawals in the amount of $500 each on January 27, 2014.  On January 30, 2014, SEGBEFIA transferred another $2,925.76 to the EASTERN STARS, LLC SUNTRUST account ending in 6502.  And finally, on February 3, 2014, SEGBEFIA withdrew the remaining $295.07 to close the account.

43.     The EASTERN STARS, LLC SUNTRUST account ending in 2877 was open for approximately eighteen days and had only one deposit before the account was fully emptied and closed on February 3, 2014.

44.     The case agent also obtained and reviewed records for the EASTERN STARS, LLC SUNTRUST account ending in 6502.  This account is a business checking account opened on or about January 16, 2014.  SEGBEFIA is the only authorized signer on the account.  The address listed for EASTERN STARS, LLC is 14106 Chesterfield Rd, Rockville, MD 20853.  However, at some point after the statement ending date of March 31, 2014, SEGBEFIA changed the mailing address to **14225 Grand Pre Rd, Apt 101, Silver Spring, MD 20906**.

45.     The January 16, 2014 opening deposit consisted of a $100 cash deposit.  The only other deposits into the account were the two transfers from the EASTERN STARS, LLC account ending in 2877, specifically the $19,000 transfer on January 27, 2014 and the $2,925.76 transfer on January 30, 2014.

11



46.     There were only three (3) withdrawals from the account, a SUNTRUST official cashier's check in the amount of $18,150, a point of sale debit in the amount of $945.15, and a teller cash withdrawal of $2,930.62 on January 30, 2014.  These three transactions brought the account balance down to $0.00.  There were no other transactions for the account noted during the investigation and the account balance is still $0.00.

47.     The case agent contacted MORONI company representatives and learned that the MORONI check for $23,225.76 was intercepted and altered subsequent to the company issuing the check and mailing it to the intended vendor.

48.     MORONI originally issued the check to a longtime and regular vendor named Masternet LLC, with an address of 690 Gana Crt., Mississauga, ONT L5S 1P2.  The check was issued on December 27, 2013, with check number 015231, in the amount of $23,225.76.  MORONI learned their check had been fraudulently intercepted, altered, and deposited when Masternet LLC contacted the company notifying MORONI they had not received their payment.

49.     MORONI immediately notified their bank, Bank of America (BOA), of the fraud.  After investigating the matter, BOA determined MORONI was a victim of a check fraud scam and credited MORONI's account $23,225.76 to cover the fraudulently altered check.

50.     The case agent contacted BOA officials and confirmed the facts of the check fraud and that the bank has sustained a loss due to the fraudulent check in the amount of $23,225.76.

51.     During the investigation, the case agent obtained BB&T auto loan records for a 2010 Toyota Camry purchased by SEGBEFIA on or about August 5, 2013.  In order to purchase the Camry, SEGBEFIA had to finance $19,469.77 via BB&T auto loan number ending in 9854-



1001.

52.     The case agent noted SEGBEFIA made several loan payments subsequent to the closing of the auto loan.  On or about January 27, 2014, SEGBEFIA paid the loan off with the $18,150 SUNTRUST cashier's check, check number 0321011883, dated January 27, 2014, made payable to BB&T Bank.  The cashier's check notes the purchaser is SEGBEFIA.

53.     The case agent concludes SEGBEFIA conducted the $23,225.76 check fraud scheme and benefited personally as a result of the fraud by paying off his personal vehicle loan and withdrawing the remaining funds for cash and personal expenses.

   **F.     Wire Fraud – Victim Dosko Co Ltd**

54.     During the investigation, the case agent became aware of an EASTERN STARS, LLC account maintained at TD Bank.  The case agent obtained bank records for the account. The EASTERN STARS, LLC account ending in 0315 is a business checking account that was opened on or about December 12, 2013.  SEGBEFIA is the only authorized signer on the account.  The address listed for EASTERN STARS, LLC is 14106 Chesterfield Rd, Rockville, MD 20853.  However, at some point after the statement ending date of June 30, 2014, SEGBEFIA changed the mailing address to **14225 Grand Pre Rd, Apt 101, Silver Spring, MD 20906**.

55.     After reviewing the account records, the case agent noted on October 22, 2014 TD Bank seized $262,031.91, the current balance of the account that day, and closed the account.

56.     The case agent contacted TD Bank investigators and learned the EASTERN STARS, LLC account ending in 0315 had been closed due to what the bank deemed fraudulent wire activity.

13



57.     On or about August 26, 2014, Dosko Co LTD (DOSKO), located in South Korea, wired $375,000 into the EASTERN STARS, LLC account ending in 0315.

58.     On or about August 28, 2014, a DOSKO official contacted the bank and initiated a wire recall request in the amount of $375,000 claiming the payment was induced under false pretenses.

59.     The DOSKO official advised the company was working with a talent agency located in Japan to book singer Pharrell Williams for a concert in Seoul, South Korea.  The booking agent was provided with a contract and invoice in the name of EASTERN STARS, LLC.  EASTERN STARS, LLC claimed to be Williams' legal representative.

60.     The booking agent was provided with fake documents, email addresses, and the names of Williams' real management team, particularly Mick Moreno, the road manager for Williams.  Soon after DOSKO sent the wire to the EASTERN STARS, LLC TD Bank account ending in 0315, they were notified the individual the Japanese talent booking agent was working with was NOT Moreno, that EASTERN STARS, LLC was not in any way affiliated with Williams, and that DOSKO had been scammed.

61.     Prior to the $375,000 wire deposit on August 26, 2014, the EASTERN STARS, LLC account balance was $769.29.  The very next day, August 27, 2014, SEGBEFIA initiated two outgoing wires in the amount of $55,000 and $50,000, and made a bank teller counter withdrawal of cash in the amount of $8,600.  Before DOSKO's wire recall request, SEGBEFIA had managed to withdrawal a total of $113,600 from the account.

62.     The $55,000 wire was made to a company named Source 4 Africa, located at 1 Cory Road, Morristown, NJ.  The $50,000 wire was made to a company named Bluefield

14





Associates Inc., located at 1100 North Hellman Ave, Ontario, CA.

63.    Open source Internet research identifies Source 4 Africa as an American marketing company for beauty product manufacturers located in the United States who target markets located in African countries.   In addition, open source Internet research identifies Bluefield Associates Inc. as an international cosmetics distributor for skincare products for people of color.

64.    Attempts were made by TD Bank officials to contact SEGBEFIA with negative results.  Based on DOSKO's complaint and wire recall request, the unrelated outgoing wire and cash withdrawals from the account subsequent to the $375,000 wire, and SEGBEFIA's unresponsiveness to TD Bank's attempts to contact him, TD Bank concluded the account was being used for fraudulent purposes, seized the remaining account balance of $262,013.91, and closed the account.

65.    In addition to the alleged DOSKO wire fraud transactions, the case agent noted from review of the EASTERN STARS, LLC TD Bank ending in 0315, SEGBEFIA more than likely had been using this account to fraudulently induce unsuspecting women to wire him money under false pretenses.  The case agent noted multiple incoming wires from potential female victims, not unlike the wires received in SEGBEFIA's EASTERN STARS, LLC BB&T account ending in 9123.  The case agent noted soon after the incoming wires were credited to the account, SEGBEFIA disbursed the funds in the form of large bank teller counter withdrawals of cash, ATM withdrawals, an international wire to an account on behalf of an individual located in the Dubai United Arab Emirates, and numerous personal expenses.

**G.    ADDRESS CHANGE**

15



66.     The case agent has obtained copies of United States Postal Service (USPS) Change of Address forms for SIGISMOND SENYO SEGBEFIA and for EASTERN STARS, LLC.

67.     On or about May 5, 2014, SEGBEFIA submitted a USPS Change of Address form to notify the USPS he had moved from 14106 Chesterfield Road, Rockville, MD 20853 to his new address of **14225 Grand Pre Road, Apt. 101, Silver Spring, MD 20906**.  On the form, SEGBEFIA indicated the move was not temporary and the effective date of the move was May 5, 2014.

68.     The case agent has become familiar with SEGBEFIA's signature from the review of numerous official financial records and documents which bear SEGBEFIA's signature.  The case agent observed a signature on the bottom of the Change of Address form that appeared to match the signature of SEGBEFIA.

69.     On or about June 16, 2014, SEGBEFIA submitted a USPS Change of Address form to notify the USPS EASTERN STARS, LLC had moved from 14106 Chesterfield Road, Rockville, MD 20853 to a new address of **14225 Grand Pre Road, Apt. 101, Silver Spring, MD** 20906.  On the form, SEGBEFIA indicated the move was not temporary and the effective date of the move was June 16, 2014.

70.     The case agent has become familiar with SEGBEFIA's signature from the review of numerous official financial records and documents which bear SEGBEFIA's signature.  The case agent observed a signature on the bottom of the Change of Address form that appeared to match the signature of SEGBEGIA.

71.     On or about January 16, 2015, SEGBEFIA departed the United States from Dulles

16



International Airport to Ghana.  SEGBEFIA remained outside the United States until his return on April 21, 2015.

72.     SEGBEFIA arrived in the United States via Delta Flight 479 from Accra, Ghana via John F. Kennedy International Airport (JFK) at approximately 5:00pm.  SEGBEFIA was subsequently taken into custody pursuant to an arrest warrant issued by a Magistrate Judge in the Western District of Pennsylvania on January 26, 2015.

73.     On April 21, 2015, the current apartment lease agreement was obtained for **14225 Grand Pre Road, #101, Silver Spring, MD 20906**.  SEGBEFIA is currently listed as a tenant for **14225 Grand Pre Road, #101**.  The lease is current and set to expire on April 30, 2015.

74.     On April 22, 2015, United States Postal Inspectors researched and confirmed that SEGBEFIA is still receiving mail at **14225 Grand Pre Road, #101, Silver Spring, MD 20906**. SEGBEFIA has not completed and submitted a United States Postal Service (USPS) Change of Address Form for either himself or EASTERN STARS, LLC, indicating he has moved or is no longer receiving mail at his **14225 Grand Pre Road** apartment.

75.     Based upon the facts set forth in this Affidavit, there is probable cause to believe that SIGISMOND SENYO SEGBEFIA has committed Wire Fraud, Bank Fraud, Identity Theft, and Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1343, 1344, 1028, and 1028A, and that evidence in the form of fruits and instrumentalities of those crimes will in fact be located in **14225 Grand Pre Road, Apt. 101, Silver Spring, MD 20906**.

### CONCLUSION

76.     Based upon the facts set forth in this Affidavit, there is probable cause to believe that SIGISMOND SENYO SEGBEFIA has committed Wire Fraud, Bank Fraud, Identity Theft,

17



and Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1343, 1344, 1028, and 1028A, and that evidence in the form of fruits and instrumentalities of those crimes will in fact be located in **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**.

<u>**PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED**</u>

77.     Based upon the foregoing and the experience of the law enforcement personnel working on this case, I submit that there is probable cause to believe that evidence related to violations of the specified federal offense is located at **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**.

78.     In addition to the evidence set forth herein, I also know through my law enforcement training and experience that persons engaged in wire fraud and aggravated identity theft offenses routinely keep notes, records, and/or computer files which contain evidence of the violations of criminal statutes.  I know that companies and individuals typically maintain and store these types of records in paper and computer form.  These documents are often maintained in filing cabinets, boxes, or computer files located in their home or office space.

79.     Your affiant knows through records reviewed in this investigation that documents and records, including financial and investor documents, appear to have been electronically created by means of a computer, or other electronic devices, with the use of related electronic equipment, such as printers, scanners, and/or copiers.  Your affiant is also aware that the victims of the crime communicated with the subject targets by telephone and electronic communication such as a Yahoo email account.  Your affiant knows from experience that electronic devices such as computers, tablets and smart phones likely stored communications on the device, but are also instrumentalities of the crimes.

18

80.     Based upon the foregoing, there is probable cause to believe that the items in

Attachment B, related to SIGISMOND SENYO SEGBEFIA and EASTERN STARS, LLC, are

located at the Premises to be Searched.

## **SEARCH OF COMPUTERS**

### A.     **Technical Terms**

77.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a)     IP Address: The Internet Protocol address (or simply "IP address") is a unique
numeric address used by computers on the Internet.  An IP address looks like a
series of four numbers, each in the range 0-255, separated by periods (e.g.,
121.56.97.178).   Every computer attached to the Internet computer must be
assigned an IP address so that Internet traffic sent from and directed to that
computer may be directed properly from its source to its destination.   Most
Internet service providers control a range of IP addresses.  Some computers have
static—that is, long-term—IP addresses, while other computers have dynamic—
that is, frequently changed—IP addresses.

b)     Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other.  Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the same
state.

c)     Storage medium: A storage medium is any physical object upon which computer
data can be recorded.  Examples include hard disks, floppy disks, flash memory,
CD-ROMs, and several other types of magnetic or optical media not listed here.

### B.     **Computers, Electronic Storage, and Forensic Analysis**

78.     As described above and in Attachment B, this Application seeks permission to

search for records that might be found at the Subject Premises to be Searched, in whatever form

they are found.  One form in which the records might be found is data stored on a computer's





hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e) (2) (B).

79.     I submit that if a computer or storage medium is found at the Subject Premises to be Searched, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a)      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d)      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e)      Based on and actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, transmit, and print documents used in the scheme to defraud.

20



80.     As further described in Attachment B, this Application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the

warrant, but also for forensic electronic evidence that establishes how computers were used, the

purpose of their use, who used them, and when. There is probable cause to believe that this

forensic electronic evidence will be on any computer at the Subject Premises to be Searched

because:

a)     Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active. Web browsers,
e-mail programs, and chat programs store configuration information on the
storage medium that can reveal information such as online nicknames and
passwords. Operating systems can record additional information, such as the
attachment of peripherals, the attachment of USB flash storage devices or other
external storage media, and the times the computer was in use. Computer file
systems can record information about the dates files were created and the
sequence in which they were created.

b)     As explained herein, information stored within a computer and other electronic
storage media may provide crucial evidence of the "who, what, why, when,
where, and how" of the criminal conduct under investigation, thus enabling the
United States to establish and prove each element or alternatively, to exclude the
innocent from further suspicion.  In my training and experience, information
stored within a computer or storage media (e.g., registry information,
communications, images and movies, transactional information, records of
session times and durations, internet history, and anti-virus, spyware, and
malware detection programs) can indicate who has used or controlled the
computer or storage media. This "user attribution" evidence is analogous to the
search for "indicia of occupancy" while executing a search warrant at a residence.
The existence or absence of anti-virus, spyware, and malware detection programs
may indicate whether the computer was remotely accessed, thus inculpating or
exculpating the computer owner.  Further, computer and storage media activity
can indicate how and when the computer or storage media was accessed or used.
For example, as described herein, computers typically contains information that
log: computer user account session times and durations, computer activity



associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c)   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d)   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f)   Based on experience, I know that when an individual uses a computer to perpetrate a fraud scheme, the individual's computer will generally serve both as

22



an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

81.     In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from a premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a)      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b)      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.    Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its



data on a premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c)      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

82.      Based on the foregoing, and consistent with Rule 41(e) (2) (B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

83.      This application requests the issuance of a warrant under 21 U.S.C. § 853(f) authorizing the seizure of property subject to forfeiture. This is appropriate because: (1) there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, and (2) an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture. There is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture, because 18 U.S.C. § 1030(i)(1)(A) provides that the defendant's "interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation" shall be forfeited to the United States.



84.     As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, agents will copy data, rather than physically seize computers, to reduce the extent of disruption. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it after a reasonable period of time.

Respectfully submitted,

Loi Cao, Special Agent, FBI

Sworn to and subscribed before me
this 22nd day of April, 2015

Thomas M. DiGirolamo
United States Magistrate Judge



## **ATTACHMENT A**

    The residence is a two bedroom apartment within a multifamily residential building having a common street address of **14225 Grand Pre Road, Apt 101, Silver Spring, MD 20906**.  The entrance to the apartment building has a red colored awning with the numeric insignia "14225" displayed in white.  (Hereafter, subject residence)





**ATTACHMENT B**
**DESCRIPTION OF PROPERTY TO BE SEIZED**

All records, instrumentalities, fruits and/or evidence located at 1**4225 Grand Pre Road, Apt 101, Silver Spring, MD 20906** relating to violations of 18 U.S.C. §§ 1349, 1343, 1344, 1028, and 1028A from October, 2013 to present, including all documents and computers located therein, including those items described in Sections I, and II below.

The term "Records" or "Information" when used in this attachment include all of the items of evidence in whatever form, and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies), and shall include the following: investor statements, mail, correspondence, financial statements, credit card statements, checks, bank records, bank account statements, financial ledgers, notes, diaries, spreadsheets, account opening documents; electronic correspondence; letters; credit reports; customer service records; invoices; money service business documents; Western Union or MoneyGram transaction documents; telephone records.

Section I

a. Records relating to violations of the federal statutes listed above for Sigismond Senyo Segbefia and/or Eastern Stars, LLC;

b. Records concerning bank accounts, credit, or prepaid card accounts in the name of or used by Sigismond Senyo Segbefia and/or Eastern Stars, LLC;

c. Records concerning individuals and entities who have conducted business transactions with Sigismond Senyo Segbefia and/or Eastern Stars, LLC;

d. Records relating to Mark A. Wagner, including email account awagnerm@yahoo.com;

e. Individual and business bank account records, including savings, checking, credit card accounts, retirement accounts, certificates of deposit, money market accounts, records should include but not be limited to; bank statements, passbook accounts, signature cards, monthly, quarterly, and or yearly statements of account, deposit and withdrawal tickets, deposit and withdrawal items, credit memos, debit memos, cancelled checks, check stubs, money orders, cashier's checks, bank drafts, loan applications and any related financial statements, mortgages and or promissory notes, loan ledgers, loan statements of account, applications, automobile loans documents and any related records, wire transfer receipts,




cashier's check receipt and purchases, and any other records relating to banking activities;

f.  Retained copes of all federal, state, and/or local tax returns, whether individual, partnership, sole proprietorship, corporate or other business entities, or trusts; whether filed or unfiled, including any and all schedules, work papers, notes and/or forms, 940, 941, K-1, W-2, W-3, W-9, SS-4, 1065, 1098, 1099, 1040, 1041, 1120, 1120S, 5498, Schedule C, or other unnamed tax forms or schedules;

g.  Records pertaining to the payment, receipt, transfer, or storage of money or other things of value by Sigismond Senyo Segbefia and/or Eastern Stars, LLC, including, without limitation:

   a.  Bank, credit union, investment, money transfer, safe deposit boxes, and other financial accounts;
   b.  Credit and debit card accounts;
   c.  Tax statements and returns;
   d.  Business and personal expenses;
   e.  Income, whether from wages or investments;
   f.  Loans;

h.  Any and all records and documents, whether foreign or domestic, relating to the sale or acquisition of various assets that were purchased, sold, rented or leased, held in trust, or donated/gifted; to include, vehicles, jewelry, watches, high end clothing, residential, retail and/or commercial real estate/apartments or office space, virtual office services, computers, laptops, related software and accessories, precious metals and any other items evidencing the acquisition, disposition, transfer or secreting, or concealment of assets and/or related income or expenditures of money;

Section II

1.      All computer hardware, computer software, computer-related documentation, and storage media identified below.

Off-site searching of such hardware, software, documentation, and storage media may be conducted and shall be limited to searching for the items described in Section I of this attachment and shall be done according to the procedures set out below.

a.  Any computer equipment and storage device capable of being used to commit, further or store evidence of the federal offenses listed above;

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners capable of being used to commit, further or store evidence of the federal offenses listed above;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit, further or store evidence of the federal offenses listed above;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

g.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data, and;

h.  Files, records, programs, logs, electronic communications, scanning programs, financial records and routing configuration software.

2.  Procedures For Seizing Computers And Related Devices

a.  Seizing hardware and software
Agents are authorized to seize and remove from the premises the computer hardware, software, related documentation, and storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.  The retrieval process does not need to be completed within 10 days after the date of the warrant or before the return of the written inventory required by Fed. R. Crim. P. 41(a).

b.  Returning hardware and software
If, after inspecting a seized computer system, the agents and computer analysts determine that these items are no longer necessary to retrieve and preserve electronic evidence, the prosecutor determines that they need not be preserved as evidence, fruits or




instrumentalities of a crime, and these items do not contain contraband, they should be returned within a reasonable time, upon written request.

If the computer system cannot be returned, agents should, upon written request, make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that are neither the fruits nor instrumentalities of crime nor contraband.